TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION
No. 13-1966

RADU PASOVSCHI, Plaintiff(s)

v.

HEWLETT PACKARD COMPANY, Defendant(s)

### SUMMONS

To the above-named Defendant: Hewlett Packard Company

You are hereby summoned and required to serve upon Timothy M. Hughes plaintiff's attorney, whose address is 557 Dutton Rd, Sudbury, MA 01776 978-443-4466, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Middlesex 200 Trade Center, Woburn MA 01801 either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, **Barbara J. Rouse**, Esquire, at ...............................

the ........................... day of ...........................

..................., in the year of our Lord ...........................

Clerk

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

FORM NO. SUP. — 001

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                                          SUPERIOR COURT DEPT.
                                                       OF THE TRIAL COURT

| | |
|---|---|
| RADU PASOVSCHI ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | CIVIL ACTION NO. 13-1966 |
| HEWLETT PACKARD ) | |
| COMPANY ) | |
| ) | |
| Defendant ) | |

## COMPLAINT

### Introduction

This action arises out of an offer and promise of employment made by defendant Hewlett-Packard Company to the Plaintiff Radu Pasovschi during 2011 that was later improperly rescinded. The defendant's breach of its promises and the plaintiff's reliance on those promises caused the plaintiff to suffer great financial damage. The plaintiff therefore seeks recovery for breach of contract, promissory estoppel and misrepresentation, fraud and deceit.

### The parties and jurisdiction.

1. The plaintiff Radu Pasovschi is an individual who resides at 61 Great Pond Road, Andover, Massachusetts 01845.

2. Upon information and belief, the defendant Hewlett-Packard Company ("HP") is a corporation organized and existing under the laws of the state of Delaware, and has a principal place of business at 3000 Hanover Street, Palo Alto, California 94304. HP also has a usual place of business in Andover, Massachusetts.

3. This court has personal jurisdiction over HP under G. L. c. 223A, §3(a)-(d) in that HP regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth, and Pasovschi's claims arise out of HP's transacting business in the Commonwealth, contracting to supply goods and things within this Commonwealth, causing Pasovschi tortious injury by an act or omission in this

Commonwealth, and causing Pasovschi tortious injury in this Commonwealth by an act or omission outside this Commonwealth.

## General Allegations Applicable to All Counts

### Mr. Pasovschi's experience

4. Pasovschi is a senior, C-level executive with over 25 years experience in executive leadership in financial services. Prior to August of 2011, Mr. Pasovschi had held positions with a number of significant institutions, including Price Waterhouse, Putnam Investments GoldK, Orbitex Retirement, Deloitte & Touche, and Capgemini's Financial Services USA unit.

### HP offers Mr. Pasovschi Position as Vice President AMS Financial Services and induces Mr. Pasovschi to forgo other employment and suffer significant financial and other damages.

5. In early August of 2011, Mr. Pasovschi was contacted by the executive recruiting firm Heidrich & Struggles ("H&S") on behalf of HP out of H&S' Boston office. At that time, HP was seeking to fill the position of Vice President AMS Financial Services (hereinafter "the VP position"). Between August 9, 2011 and late October, 2011, Mr. Pasovschi had extensive discussions and negotiations with HP and H&S (acting on HP's behalf) that culminated in HP directly offering the VP position to Mr. Pasovschi and inducing Mr. Pasovschi to forego other lucrative employment and incur significant financial obligations.

6. HP first contacted Mr. Pasovschi in North Andover, Massachusetts on August 9, 2011, through Sam Atkins, a senior consultant at H&S. In a series of emails and telephone calls on that date, Mr. Atkins advised Mr. Pasovschi of the position HP was seeking to fill, and, after some discussion on the phone about Mr. Pasovschi's background and compensation expectations, Mr. Atkins confirmed that HP was offering competitive annual salary and benefit, including approximately $400,000 in base salary and bonuses in the $200,000—$400,000 range. Mr. Atkins also informed Mr. Pasovschi that Mr. Pasovschi was a "viable candidate" for the VP position.

7. H&S then contacted Mr. Pasovschi several times by email and telephone on August 9 and August 10, 2011, in order to further the process and arrange for a meeting between Mr. Pasovschi and Darren Cinti, H&S' "Senior Partner-in-Charge, Boston Office" who was "driving the HP search." At or around this time, H&S also provided Mr. Pasovschi with HP's "Company, Position and Person Profile."

8. Mr. Pasovschi then met with Mr. Cinti on August 17, 2011, at the Guest Quarters Hotel in Waltham, Massachusetts. During the meeting, Mr. Cinti described the benefits of working at HP, and after some discussion of Mr. Pasovschi's experience, background, and management style, Mr. Cinti told Mr. Pasovschi that he would fit in well at HP and that Mr. Pasovschi would "hit it off" with John Visentin, Executive Vice President and

2

General Manager of HP Enterprise Services, whom Mr. Cinti referred to as "the last person in the hiring process." During this meeting, Mr. Pasovschi also informed Mr. Cinti that he was in the process of interviewing for an executive-level position with another prospective employer. (That employer, though not identified by Mr. Pasovschi at the time, was Price Waterhouse, with whom Mr. Pasovschi had previously been employed for 13 years.) In response, Mr. Cinti advised Mr. Pasovschi that he would expedite the hiring process with HP.

9. After the meeting on August 17, H&S continued to contact Mr. Pasovschi by email and telephone in North Andover in order to arrange a call between Mr. Pasovschi and Catherine Halvorson, HP's Director, Human Resources, Enterprise Services Americas.

10. On August 19, 2011 Ms. Halvorson contacted Mr. Pasovschi by telephone in North Andover. During the call, Ms. Halvorson and Mr. Pasovschi discussed the VP position and HP's "key deliverables" as described in HP's "Company, Position and Person Profile." In particular Ms. Halvorson and Mr. Pasovschi discussed HP's expectation that the VP candidate would "[take] an $800M portfolio and rapidly [scale] it to $3B+ in short order." Ms. Halvorson asked Mr. Pasovschi how long he believed it would take to accomplish this deliverable. Mr. Pasovschi responded that, given its scope, the endeavor would take several years to complete. Ms. Halvorson did not express any disagreement. As a result, Ms. Halvorson informed Mr. Pasovschi that they would proceed to the next step in the hiring process within HP, which would be to meet with James Best, HP's Vice President, America Sales.

11. During the following week Mr. Cinti contacted Mr. Pasovschi again by telephone and email concerning the VP position. During the telephone conversations, Mr. Cinti informed Mr. Pasovschi that the meeting with Catherine Halvorson had gone well, and that HP was proceeding with the process. After some communications regarding possible additional meetings with H&S representatives involved in the hiring process for HP, Mr. Cinti informed Mr. Pasovschi that the next meeting would be with Mr. Best, as Ms. Halvorson had indicated.

12. On August 31, 2011, Mr. Pasovschi traveled, at HP's request, to HP's office in Andover, Massachusetts for a video conference call with Mr. Best from his office in Plano, Texas. During the video meeting, Mr. Best and Mr. Pasovschi discussed the VP position, the culture at HP, what Mr. Best described as the benefits of working at HP, and HP's goal of increasing sales from $800 million to three billion. Mr. Best also informed Mr. Pasovschi that he would be a good fit at HP and that he would get along well with John Visentin.

13. Within a day or so of the video meeting with Mr. Best, Mr. Cinti again contacted Mr. Pasovschi on behalf of HP. Mr. Cinti advised Mr. Pasovschi that Mr. Cinti had gotten feedback from HP, that the meeting with Mr. Best had gone well, and that HP was ready to make a written job offer and wanted Mr. Pasovschi to provide professional references. Mr. Pasovschi informed Mr. Cinti that he did not want to "burn references"

before receiving a written offer. In response, Mr. Cinti assured Mr. Pasovschi that HP was serious about making an offer. Accordingly, on September 1, 2011, Mr. Pasovschi-- persuaded that an offer was imminent-- provided the requested references to Mr. Cinti by email.

14. After several further rounds of communication with H&S, Mr. Pasovschi was asked to meet with Mr. Visentin—James Best's boss and "the last step in the hiring process." On September 13, 2011, Mr. Pasovschi met with Mr. Visentin at the Hyatt Hotel in Greenwich, Connecticut for a 7:45 a.m. breakfast meeting. During this meeting, Mr. Visentin described the benefits of working for HP. He and Mr. Pasovschi also discussed Mr. Pasovschi's background and HP's key deliverables, including HP's plan to grow HP's Americas Financial Services sector from $800 million to three billion dollars over the next three years. Mr. Visentin and Mr. Pasovschi also discussed compensation, with Mr. Visentin agreeing that Mr. Pasovschi could expect salary in the range of $425,00 with annual bonuses in the $200,000 to $400,000 range. At the end of the meeting, Mr. Visentin represented to Mr. Pasovschi that he (Mr. Visentin) intended to have HP's Executive Recruiter, Brad Hayes, get involved in putting together a written offer to Mr. Pasovschi and that Mr. Hayes would contact Mr. Pasovschi.

15. On or about September 20 or September 21, 2011, Mr. Cinti again contacted Mr. Pasovschi by telephone. During this call, Mr. Pasovschi reminded Mr. Cinti that he (Mr. Pasovschi) had been interviewing with another prospective employer (again, Price Waterhouse) and that he was well along in the hiring process with that employer. Mr. Cinti expressed concern that Mr. Pasovschi would accept the alternative employment from PW, and, in an effort to ensure that HP did not lose the opportunity to hire Mr. Pasovschi, Mr. Cinti indicated that he wanted to have Michael Cullen, the H&S partner in charge of the global HP relationship, contact Mr. Pasovschi to "keep [Mr. Pasovschi] warm."

16. On September 22, 2011, following the Greenwich, Connecticut meeting with Mr. Visentin, and after HP had requested and obtained Mr. Pasovschi's educational information through H&S, Mr. Cinti again contacted Mr. Pasovschi by email. Mr. Cinti advised that HP was "feeling great" about Mr. Pasovschi and that, while HP planned to meet with another candidate on September 26, Mr. Pasovschi was the "lead candidate."

17. On September 24, 2011, Mr. Cullen called Mr. Pasovschi while Mr. Pasovschi was travelling to interview with PW. Mr. Cullen informed Mr. Pasovschi that HP was very interested in him and "did not want to lose him" to another employer. Mr. Cullen then stated that HP was "going to make a written offer imminently."

18. On September 27, 2011--the day after HP's scheduled meeting with the alternative candidate referred to in Mr. Cinti's September 22 email--Mr. Hayes called Mr. Pasovschi on his cell phone at 11:00 a.m. while Mr. Pasovschi was at Logan Airport. At that time, Mr. Pasovschi was about to board an 11:30 flight to New York to meet with PW for a final interview. Mr. Hayes requested that Mr. Pasovschi not attend the meeting with PW, and in order to induce Mr. Pasovschi to cancel the meeting, specifically stated

4

to Mr. Pasovschi that HP "had an offer ready to be sent out." Mr. Hayes also asked Mr. Pasovschi to identify his compensation expectations, and Mr. Pasovschi replied that he was expecting an annual salary of $425,000, eligibility for a performance bonus of at least $200,000, and payment of a $35,000 hiring bonus. Mr. Hayes agreed that the offer would contain compensation figures in that amount. As a direct result of and in reasonable reliance on Mr. Hayes' representations and promises that the HP offer was forthcoming and thus little more than a bureaucratic formality, Mr. Pasovschi cancelled the meeting with PW, as Mr. Hayes had requested.

19. Shortly after his September 27 conversation with Mr. Hayes, Mr. Pasovschi emailed Mr. Cinti and Mr. Cullen at H&S and advised them that he'd gotten a call from HP that morning and that HP was "moving forward on an offer this week." Mr. Cinti responded on the same day by email saying "[g]reat stuff Rad!" Mr. Cullen responded by email saying "good news" and advising Mr. Pasovschi that he (Mr. Cullen) would be speaking with Mr. Hayes later that day and would let Mr. Pasovschi know if anything came up during the call. Neither Mr. Cinti's nor Mr. Cullen's email responses disputed HP's intent to make a written offer that week, nor did Mr. Cullen, after speaking with Mr. Hayes later that day, dispute that intent.

20. On October 3, 2011, Mr. Pasovschi, having not received a written offer, contacted Darren Cinti at H&S to inquire as to the status of the matter. Mr. Cinti indicated that he would inquire with HP and get back to Mr. Pasovschi.

21. Then, on October 7, 2011, at 9:47 a.m., Brad Hayes called Mr. Pasovschi on his cell phone in Massachusetts. In that call--which occurred while Mr. Pasovschi was in Massachusetts Probate Court for a trial in connection with child support and alimony proceedings with his ex-wife--Mr. Pasovschi again inquired as the status of the matter. In response, Mr. Hayes told Mr. Pasovschi that the written HP offer, on terms previously discussed, was a "done deal" and that the offer letter was being sent out, subject only to the formality that Mr. Valentin sign it. In direct and reasonable reliance on Mr. Hayes' representations that the offer was a "done deal" and that all that remained was a bureaucratic formality, Mr. Pasovschi entered in to an agreement with his ex-spouse, later entered as court order, for substantially increased financial support payments for his ex-wife and their two children, then ages 13 and 18. Specifically, Mr. Pasovschi agreed to financial obligations that, over the next 8 years, will result in hundreds of thousands of dollars in additional financial obligations.

22. In another telephone call on October 17, Mr. Hayes again assured Mr. Pasovschi that the offer from HP was a "done deal," and in subsequent calls on October 18, October 21, and October 25, 2011, Mr. Hayes continued to assure Mr. Pasovschi that a written offer from HP was imminent. Mr. Pasovschi in fact explicitly referred to Mr. Hayes' assurances of a "done deal" in an email to Mr. Hayes on October 20, 2011, to which Mr. Hayes made no objection.

**HP reneges on its promise to make a written offer to Mr. Pasovschi, causing Mr. Pasovschi to suffer great damage**

5

23. Despite HP's repeated representations and promises of employment, on or around November 11, 2011, HP reneged on those representations and promises. At that time, Mr. Hayes informed Mr. Pasovschi in a telephone call that HP "was moving in a different direction." Mr. Pasovschi was not given any reason for HP's decision.

24. HP's actions directly caused great financial harm to Mr. Pasovschi, and considerable damage to his professional interests and reputation. As noted above, HP's actions not only deprived him of the income he would have earned at HP, but caused him to lose the opportunity for extremely lucrative employment at PW and caused him to incur substantial additional financial support obligations to his ex-spouse and children of that marriage.

## Count 1
### Breach of Contract

25. Pasovschi repeats and realleges all prior paragraphs as if set forth fully herein.

26. By its actions as described above, HP entered into a binding contract of employment with Pasovschi. HP breached that contract by improperly rescinding its offer, causing great financial harm to Pasovschi.

## Count 2
### Promissory Estoppel/Detrimental Reliance

27. Pasovschi repeats and realleges all prior paragraphs as if set forth fully herein.

28. In making he representations and promises described above, HP intended that Pasovschi rely on such representations and promises, and Pasovschi in fact reasonably relied on the promises and representations to his detriment.

## Count 3
### Deceit and Misrepresentation

29. Pasovschi repeats and realleges all prior paragraphs as if set forth fully herein.

30. On September 24, 2011, HP, through its agent H&S, represented to Mr. Pasovschi that that HP was "going to make a written offer [of employment] imminently." On September 27, 2011, HP represented to Pasovschi that it "had an offer [of employment] ready to be sent out." On October 7, 2011, HP represented to Pasovschi that an offer of employment was a "done deal" and that the offer letter was being sent out. At the time that these representations were made, HP and its agents knew or should have know that the representations were false, and either did not accurately state the status of the hiring process with respect to Pasovschi or did not accurately state HP's intentions.

31. HP's representations were false, were clear and unequivocal, and were indisputably intended to keep Mr. Pasovschi "on a string" to induce him to forbear from accepting employment elsewhere. Mr. Pasovschi reasonably relied on these representations, and suffered great financial harm.

Wherefore, the Plaintiff Radu Pasovschi respectfully requests that this Court:

1. Enter judgment in favor of the plaintiff Radu Pasovschi against the defendant Hewlett-Packard Company on all counts of the complaint, together with costs and interest.

2. Grant such other relief as may be just and equitable.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL MATTERS THAT ARE SO TRIABLE

RADU PASOVSCHI,
BY HIS COUNSEL,

_____
Timothy M. Hughes
Attorney at Law
557 Dutton Road
Sudbury, MA 01776
978-443-4460
hugheslaw1@verizon.net

Dated: 5/23/13

7